BOARD OF TRUSTEES OF PARK COLLEGE, Appellant, v. THE ATTORNEY-GENERAL.

Division One, May 31, 1910.

1. **COLLEGE FUNDS: Unrestricted Donations: Use for Current Expenses.** One section of the college charter provided: "The Board of Trustees are hereby forbidden to contract any debts against the corporation or to mortgage the property of the college proper, or to do any act to erect a lien upon or incumber any property given, or purchased, or vested in it, in trust or otherwise, but shall hold inviolate all furniture, stock, assets, lands, buildings, moneys or endowment funds, professorships, scholarships, or other funds, preserving them in perpetuity; handing them down to their successors forever; and all claims against the above named property shall be void in law." *Held*, that the Board of Trustees were not restricted thereby from using unrestricted and unconditional donations to pay current expenses. They are not compelled by that language to pass all such donations to the endowment fund, and to use only the subsequent income thereof to pay necessary expenses, where such expense is necessary to meet the avowed purpose of the charter to maintain a school. The primary purpose of the charter language is to prohibit the contracting of debts, and whenever it becomes necessary to avoid the contracting of a debt for necessary current expenses the board may use unrestricted donations to pay such expenses.

2. ———: ———: ———: **Meaning of Word "But": Debts.** The word "but" used in the midst of the words quoted in syllabus one from the charter, may mean "except" or "on the contrary, on the other hand," but it was probably used in the latter sense; that is, it was intended to say the trustees should incur no debt and create no mortgage or lien, on the contrary they should hold inviolate the property, etc., "using only furniture, stock, lands, buildings' and the interest of the funds." But whether it be held to mean "except" or "on the contrary," resort must be made to the first part of the sentence quoted to ascertain what the words following "but" mean; and the sentence, taking all its parts together, means that the trustees shall not jeopardize the property by incurring debts or creating mortgages, "but" shall preserve the same unbroken, and in place of incurring debt for any purpose, they may use, for that purpose, only the income of the property and the interest of the funds, and beyond that what cannot be done without going in

Trustees Park College v. Attorney-General.

debt must be left undone. Under that clause the trustees are forbidden to incur debts even for the necessary current expenses of maintaining the college. But using for necessary current expenses money given to them by donors without any directions as to the purposes for which it was to be used, is not going in debt.

3. ———: ———: ———: Meaning of "Endowment," Etc.: "Other Funds": Ejusdem Generis: Money. The words "endowment funds," "professorships" and "scholarships" are terms indicating permanent investments for particular purposes, or money designated to be so invested and held for a particular purpose. And the words "other funds," following immediately those words, mean other funds *ejusdem generis*, and their use in that connection forbids the giving to them the meaning of money in its unrestricted sense.

4. ———: ———: ———: Meaning of "Or": Ejusdem Generis. The conjunction "or," used in the sentence from the charter quoted in syllabus one, was not used in its alternative sense. The author of the charter did not mean to say the Board of Trustees should preserve intact either the moneys or the endowment funds, one or the other, as they might determine. The word "or" may be used to join different terms expressing the same thing, and that is the sense in which it was used in the charter. The word "moneys" was used by the author as synonymous with "endowment funds, professorships, scholarships, or other funds," *omnia ejusdem generis*.

5. ———: ———: Money Given for Endowment: Unconditional Donations: Use. Under the charter of Park College moneys given to the college and designated for a particular purpose, as for an endowment fund, a professorship, a scholarship, or other purpose of like character, cannot be used for any other purpose without violating the terms of the charter. But money does not become an endowment fund until it is either set apart or designated by the donor for that purpose; and money given without any designation of the purpose to which it is to be applied may be used for such purposes as the Board of Trustees may deem best for the good of the college.

6. ———: Individual Liability of Trustees: Necessary Good Faith. A trustee by accepting the office of member of the Board of Trustees, enters into an implied contract with the corporation that, in the exercise of the power that office confers on him, he will faithfully observe and obey the mandates of its charter, and he becomes personally liable to the corporation for any breach of that implied contract, if the corporation is damaged thereby. The fact that he acted with good faith would be no de-

fense if he committed a breach of the contract. But it would
be no breach of the implied contract if the transaction was one
calling for the exercise of his judgment and he exercised that
judgment in good faith, although it should turn out to be a bad
or mistaken judgment.

7. ———: ———: **Contracting Debts: Using Unrestricted Dona-
tions to Pay Expenses.** Where the charter expressly forbids
the board of trustees to create a debt on the credit of the cor-
poration, the creation of a debt by the board is a breach of the
individual trustee's implied contract, and such of the trustees
as vote for the creation of the debt become personally liable
to the corporation for the injury, if injury results. But where
there is no direction in the charter as to what is to be done with
unconditional donations, if a proposition should come before the
board to purchase for the use of the college certain property,
or to procure certain conveniences, such as water or light, and
the trustees in good faith exercise their best judgment and make
the purchase or obtain the proposed conveniences, paying for
them out of moneys belonging to the corporation which have
not been devoted to any other special purpose, the individual
trustees would not be personally liable, even though it should
turn out that the investment was a bad one and loss was en-
tailed thereby upon the corporation.

Appeal from Platte Circuit Court.—*Hon. Alonzo D.
Burnes,* Judge.

REVERSED AND REMANDED (*with directions*).

*John T. McRuer, Geo. W. Day* and *Scarritt, Scar-
ritt & Jones* for appellant.

(1) The interpretation of section 2 of article 3 of
the charter, insisted upon by the minority of the board,
to the effect that all donations made to the institution
without any restrictions or directions on the part of
the donors, must be used only to be loaned out or in-
vested to bear interest, and the interest only expended
for the needs of the institution, must be found, if at all,
in the words "other funds." The language is, "shall
hold inviolate all furniture, stock, assets, lands, build-
ings, moneys or endowment funds, professorships,
scholarships, or other funds." The minority of the

board insist that this language means that all funds coming to the institution, although not directed by donors or otherwise restricted, must be put out at interest and cannot be expended in constructing a college building, or some other necessary plant for the institution. On the other hand the majority of the board consider that the words "other funds" mean funds of a like kind and character with those that are particularly enumerated. A familiar rule of construction is that where general words follow particular ones the former should be construed as applicable to the things of the same general class as the particular words by which they are preceded. State v. Dinnisse, 109 Mo. 438; St. Louis v. Laughlin, 49 Mo. 559; State ex rel. v. Bersch, 83 Mo. App. 665. The only funds particularly mentioned to be held "inviolate" are "endowment funds, professorships, scholarships." An endowment, according to the Standard Dictionary, is "a sum settled or property devised for the permanent use of an institution." The general use and meaning of the word coincides with the dictionary definition. So a professorship and a scholarship are well known and generally understood to mean, in such a connection as we here find them, permanent funds, the income of which is used to pay the salary of a professor or the expenses of a student at an institution of learning. So we see that every one of the particular funds mentioned in this section is permanent, that is, an endowment fund. Applying the rule of construction last above mentioned, the words "or other funds," following the words "endowment funds, professorships, scholarships," should be construed to mean other funds of a similar character, that is, other permanent or endowment funds. If the words "or other funds" should be construed to mean every dollar that should be given or accrue to the institution from every source, as contended by the minority of the board, then the board would not be at liberty to use the tuition, labo-

ratory or other fees paid in each year by the students, in defraying the current expenses of the institution, but as soon as the tuition money was paid in it would become a "fund" of the institution and would have to be put out at interest; and the institution, under that construction of the charter, would not be at liberty to use the proceeds of the sale of any of the products of the soil that the record shows come from the farms tilled by the students in connection with the institution, but every dollar gotten from the sale of corn or wheat or potatoes would be "funds" of the institution and would have to be placed out at interest. Hanlon v. Floyd Co., 53 Ind. 123; Boulle v. Tomkins, 5 Redf. Sur. (N. Y.) 477; Lane v. Madgebury, 81 Wis. 344. (2)   The rule that the whole of an instruction must be construed together, and each part made to harmon-ize, if possible, with every other part, is so often invoked and is so well known that it would be more than useless to cite authorities in support of it. The application of this rule to the charter in question unquestionably, we believe, leads to the conclusion that section 2 of article 3 is only a prohibition against the creation of debts and incumbrances. U. S. v. Fisher, 2 Cranch (U. S.) 400.   (3)   It is a well-established rule of construction that the interpretation placed upon a consti-tution or charter by those executive officers whose duty it is to enforce it will be given great weight, and will not be overruled by the courts except for cogent reasons.   Ross v. Railroad, 111 Mo. 18; State ex rel. v. Severance, 49 Mo. 404; U. S. v. Railroad, 142 U. S. 615; Pennoyer v. McConnaughy, 140 U. S. 1.   (4) This charter is the constitution of this institution. In construing a constitution it is always the purpose of the court to avoid, if possible, such a construction as would lead to absurd results or even to inconvenient situations. U. S. v. Fisher, 2 Cranch (U. S.) 400; U. S. v. Kirby, 74 U. S. 486; Knowlton v. Moore, 178 U. S. 41.

*Elliott W. Major,* Attorney-General, *Wilson &
Wilson, Warner, Dean, McLeod & Timmonds* and *Geo.
A. Lawrence* for respondent.

(1) A minority of a board of trustees, charged
with the administration of a trust, may apply to a
court of equity for directions touching the administra-
tion of that trust. Any trustee having reasonable
doubt as to the proper disposition of funds in his hands
has a right, for his own safety, to apply to a court of
equity for directions. Hayden v. Marmaduke, 19 Mo.
403; Collier's Will, 40 Mo. 287; Mersman v. Mersman,
136 Mo. 244. Wherever there is a bona fide doubt as to
meaning of the instrument creating a trust, or as to the
course which the trustee ought to pursue, the trustee
is always entitled to maintain a suit in equity to obtain
a judicial construction of the trust instrument and
directions as to his conduct. State ex rel. v. Netherton,
26 Mo. App. 423; Mersman v. Mersman, 136 Mo. 244;
Drake v. Crane, 66 Mo. App. 495. A trustee may not
only ask a court of equity relative to matters involving
his duty, but also to determine as to the title between
him and others. Read v. Railroad, 75 S. W. (Tenn.)
1056. Trustees have a right to maintain an action in
equity against other trustees to correct abuses or mis-
application of the trust. Morrell v. Fowle, 144 Mass.
109; Marshall v. Caldwell, 125 Mass. 435; Dartmouth
College Case, 4 Wheat. 703; 27 Am. and Eng. Ency. Law
(1 Ed.), 151; Traphagen v. Levy, 45 N. J. Eq. 448;
McKenzie v. Trustees, 61 Atl. 1026; Dartmouth College
Case, 4 Wheat. 463. (2) The attorney-general's join-
ing in the prayer of the petition gave the court juris-
diction. Women's Christian Association v. Kansas
City, 147 Mo. 125. (3) The construction placed upon
the charter by the circuit court was proper. (a) What
weight, if any, will the court give to oral testimony, in
placing its construction upon the written words of the
charter? It is our contention that the charter speaks

for itself, and that its meaning must be gathered from the language it uses. Dwarris on Statutes and Constitutions, 110; 6 Am. and Eng. Ency. Law, 922, note, and 923; Hills v. Chicago, 60 Ill. 90; Newell v. People, 7 N. Y. 97. (b) Can it be supposed for a moment that charitably disposed persons would long continue. their generous contributions to this college if they understood the laxness of the board of trustees in these regards? State ex rel. v. Adams, 44 Mo. 577. (c) It is the contention of the majority that the writer of these sections had in mind only the prevention of incumbrances on the college property. If that were so, it would have been very easy, in few words, to have forbidden the giving of any mortgage or the contracting of any debt. The words used in the first three and a half lines of section 2 are plain and ample for that purpose. They say: "The board of trustees are hereby forbidden to contract any debts against the corporation, or to mortgage the property of the college proper, or to do any act to erect a lien upon or incumber any property given or purchased, or vested in it, in trust or otherwise." Stop there, and the prohibition is full and complete. Why say more? What else did the draftsman have in mind when using the commanding language which follows the foregoing quotation? The board is in express terms commanded to "hold inviolate all furniture, stock, assets, lands, buildings, moneys or endowment funds, professorships, scholarships, or other funds, preserving them in perpetuity—using only furniture, stock, lands and buildings, and the interest of the funds; handing them down to their successors forever." The idea clearly indicated here, as in other parts of the charter, is to amass a great volume of interest-bearing funds, so that, eventually, the college might be so securely founded that it would not be dependent, one year after another, upon the charitably inclined, nor be embarrassed by the fluctuating, uncertain, spasmodic or pan-

ic-stricken condition of the times—so that it would "stand forever and go on improving like the older institutions of Europe and America." The charter is the statute of the college. It is well understood that where there is a statute on any particular subject the statute enters into and forms part and parcel of every contract touching that subject. In other words, every contract is conclusively presumed to have been entered into with a view to the existing statute. The charter, in section 1, clothes the board with power "to receive gifts in money" and to "hold, secure and appropriate them for the use of Park College, according to the provisions of this charter and the will of the donors." If A donates a sum of money, saying: "This donation is given for the purpose of erecting an electric light and heating plant," the board must "receive" and "appropriate" it accordingly. If B donates a sum of money, large or small, saying: "This donation is given to defray current expenses of the college," the board must "receive" and "hold, secure and appropriate" it accordingly. If C donates a sum of money, large or small, saying nothing further—then what? Go to the charter and see. That instrument says it must be received, held, secured and appropriated "according to the provisions of the charter." What are those provisions relative to "money" and "other funds?" Read sections 2 and 5, article 3. The board must "hold them inviolate, preserve them in perpetuity, and hand them down to their successors forever;" and they may use only the interest on the funds, that is, spend it. The principal, large or small, must not be spent. That must be held in perpetuity, go to make up an accumulated fund, which will eventually place the college on sure, sound and safe footing, so that it will "stand forever and go on improving like the older institutions of Europe and America." In this connection, as showing that the supposed donation from C, above mentioned, must be appropriated

according to the provisions of the charter, read the Dartmouth College Case, 4 Wheat. 689; see, also, State ex rel. v. Adams, 44 Mo. 576, and Dwarris on Statutes and Constitutions, p. 110.

VALLIANT, J.—This is a suit in equity, the purpose of which is to obtain a judicial interpretation of certain clauses of the plaintiff's charter. The plaintiff corporation is an educational institution chartered under the general laws of this State, first in 1879, and again by amended charter in 1894. The college had existed as an unincorporated educational institution some years before 1879, under the care, and to a great extent at the expense, of its founder, George S. Park. From a small beginning it has grown to be an institution of large means, affording at present educational facilities to several hundred students and giving advantages to ambitious boys and girls, who have not otherwise means, to obtain education of a high degree by aid of their own industry and co-operation in the college work. It is an institution that reflects great credit on its founder and on that body of faithful men who have devoted their lives to the work. The charter gives to the board of trustees the power to fill vacancies, thus making the board self-perpetuating; it also gives them power to create vacancies by removal from office, but although now a difference has arisen between them touching the meaning of a certain clause in the charter, yet neither in the past nor in the present has there been or is there any reproach or charge of misconduct cast by one on another. We approach the consideration therefore of the point of difference between these parties with the highest respect for the opinion of each and with perfect confidence that on both sides the desire is to arrive at the true meaning of the charter.

In the first article of the charter it is declared that "the principles of the college shall be non-sectarian,

but evangelical, imbued with the spirit of Christian liberty and charity." And it is further declared that "the object of this corporation shall ever be to diffuse moral and religious principles, in the most practical and effectual manner; to afford the advantages of training and education to the youth of both sexes of the country, especially the west and southwest, to give especially facilities to youth found worthy and not having sufficient means, who may be inured to hardships, acquainted and in sympathy with the people among whom they are to live and labor, to obtain an education by labor or otherwise; thus offering a safe and unlimited opportunity to the patriotic and benevolent to assist in this great work, by their donations and endowment."

In article 2 of the charter it is provided that there shall be daily Bible readings, lectures, model Sabbath school, etc., besides a full course of instruction in science, literature and art. "In the male department shall be taught agriculture, business management, skilled labor and practical wisdom." In the female department, household and domestic duties. By such means it was declared that the students would contribute largely to their own support while gaining knowledge. "It is designed to educate by practice, training and doing as well as by teaching, and these departments of skilled labor, and science, literature and art shall be under the supervision and direction of the most competent instructors that the funds of the college will permit the trustees to employ."

Section 2 of article 3 of the charter is the section about which there is a difference in opinions, which difference has led to this suit. That section is as follows: "The board of trustees are hereby forbidden to contract any debts against the corporation, or to mortgage the property of the college proper, or to do any act to erect a lien upon or incumber any property given, or purchased, or vested in it, in trust or other-

wise, but shall hold inviolate all furniture, stock, as-
sets, lands, buildings, moneys or endowment funds,
professorships (scholarships), or other funds, pre-
serving them in perpetuity, using only furniture, stock,
lands and buildings, and the interest of the funds;
handing them down to their successors forever; and all
claims against the above named property or corpora-
tion shall be void in law; and any trustee voting or
acting against this provision of the charter, or any
other officer or agent, shall not in any way legally bind
the board of trustees of the institution, they have
superseded their authority and can only assume indi-
vidual and personal responsibility and the record of
this charter in Platte county, Missouri, shall be legal
notice thereof to all.''

From the beginning of the college it has subsisted
on donations from various sources helped out by the
labor of the students in its various industrial depart-
ments. Many of the donations have come with specific
directions from the respective donors as to the par-
ticular purpose to which they are to be devoted, and
about them there is no difference of opinion as to how
they are to be used or applied. But there are also many
donations which have come without any designation
by the donors of the purpose for which they are to be
used, and it is in reference to these that the difference
in opinions has arisen. On the part of the minority
of the board of trustees it is contended that the charter
means that donations of the last-named class must be
invested in the endowment fund and only the interest
arising therefrom can be used in defraying the ex-
penses of the institution, while the majority are of the
opinion that the principal of such donations may be
used when necessary to defray general expenses of
the college. The trial court adopted the view of the
minority and held as follows: ''And the court further
finds from the pleadings and the evidence that the
board of trustees of Park College now holds funds

aggregating about two hundred and fifty thousand dollars, which have been donated to it without any restrictions or directions by the respective donors as to the use to be made thereof, and that other funds may be similarly donated without restrictions or directions as to the use to be made thereof. It is the decree of the court that it was and is the true intent and meaning of said charter that all such funds, so donated, shall become part of the permanent funds of the college; that no part of the principal thereof shall be used or expended, but the same shall be loaned or invested so as to produce interest or income, which interest or income only shall be used or expended by said board of trustees as they may deem for the best interest of the college." From that decree this appeal has been taken.

In interpreting a clause in any written instrument it is well to read the whole instrument and derive light from its general controlling purpose, if we can.

Section 3 of this article declares that "The board of trustees shall have oversight, approval and direction of all endowment funds, of all real estate and personal property, and of all loans made of them." Then it proceeds to mention the character of the securities in which the funds may be invested.

Quotations are made in one of the briefs from section 4 as throwing light on the subject; that section is as follows: "It is the earnest desire of the friends of this institution that it be established and built up by wisdom, and stand forever and go on improving like the older institutions of Europe and America. To accomplish this purpose it is suggested that the board of trustees look most critically into the way things are going and make wise provisions for future contingencies; if any trustee neglects such care and caution, request him to resign and appoint another. It is a positive wrong to be indulgent to incapacity or inefficiency, to idleness, wastefulness or any other unfit-

ness. Let the eyes of these guardians pierce every
nook and corner and thereby insure wise and skillful
management of the institution. Let them provide the
best instructors and make the best provisions for the
institution their funds will permit, going no further.
Let them stop all leaks, stir up the indolent, get honest
work done, and make purchases as far as practicable
when prices are lowest, for 'there is a time to get.'
In summer prepare and lay up for winter. Let them
secure every trust, promptly discharge every trustee,
officer, agent, or employee, and have the business, work
and instruction done by as few men and at as small
cost as possible consistent with the true interests of the
institutions, without favor or partiality, remembering
that the Lord's work must be done better than our
own.''

At or about the time of the incorporation, Mr.
Park, the founder, executed a deed of gift to the cor-
poration conveying certain land described by metes
and bounds ''in or near Parkville'' in Platte county,
on which was situated a college building, one that had
been in use as such before the incorporation. In the
deed it was specified as the consideration that the
grant was made for the educational purposes as set
forth in the charter, that the principles of the college
were to be non-sectarian but evangelical, and that a
majority of the board of trustees were at all times to
be members of the Presbyterian church, holding the
Westminster Confession as containing the true system
of faith and doctrine; that should the trustees fail to
carry out the purposes for which the conveyance was
made and observe its conditions, then the deed assumed
to confer on a court of equity the jurisdiction to com-
pel them to do so, or to remove them and appoint others
having the prescribed qualifications. The property con-
veyed by that deed with the personal property con-
sisting of the then college equipment was all the means
that were at the disposal of the trustees with which to

carry on the work for which the college was chartered. There was then no endowment fund or fund designated for any purpose, no income and no ready money. "There was the necessary furniture for a students' dormitory and a meager equipment for college purposes." The college was started on the hope that benevolent people could be found who would contribute the means to carry on the good work, and this hope was realized during the first year after the incorporation when about $8000 was collected from such persons, and ninety-four or ninety-six students were maintained, and from that time on and up to the trial of this suit that hope has been realized and the college has grown. In 1879 the corporation's college buildings were worth about $15,000, now it owns buildings worth over $225,000; then it had no endowment or other permanent fund, now it has such funds amounting to several hundred thousand dollars, yielding interest income of over $15,000, but never from its beginning to the day of the trial had the income or interest been sufficient to defray the necessary expenses of the institution, but that income was helped out by appropriating to defraying those expenses money from donations that had come without any designation from the donors as to how it should be used. Except so much of them as were used to defray necessary expenses, those donations have been added to the endowment fund.

The foregoing facts do not afford a solution of the question, but they do show how the majority of the board of trustees have interpreted the clause of the charter in question from the beginning, and the condition of the affairs of the corporation at the start shows how the framers of the charter must have understood the language used in this now disputed clause, else they would probably have indicated how the institution should start and go until an endowment fund could be raised.

In one of the briefs, referring to the charter, the learned counsel says: "It is unique in this: That drafted, as it was, by the founder, a man not familiar with such work, it possesses every essential element of a perfect constitution: Clear and unmistakable in its terms, yet it allows elasticity that has made it entirely practical." We agree with so much of this comment as indicates that the charter was drawn by "a man not familiar with such work," but that the powers conferred on the board of trustees or that the limitations on those powers are stated in clear and unmistakable terms we do not agree. It was not the work of a lawyer or of one accustomed to writing documents with the expectation of having the words employed undergo judicial interpretation. Take the language of section 4 for example; it is full of beautiful and commendable sentiment and it is useful in the form of advice to the trustees, but as to powers given, or limitations on such powers, it throws but little light; the advice given is as applicable to the trustees in the performance of their duties prescribed by the charter, as interpreted by the majority, as it is to their duties as interpreted by the minority. It is good admonition under all circumstances and, so far as shown by this record to the contrary, it has been faithfully followed.

Section 2, which is the one concerning which there is this controversy, is very emphatic in its declaration that the trustees shall make no debt against the corporation, and it declares as a matter of law that any claim against the corporation or its property shall be void. One familiar with the law of corporations would hardly have expressed it in that way. Section 981, Revised Statutes 1879, now section 3442, Revised Statutes 1909, authorizes the organization of a corporation for a certain purpose and with certain conditions which corporation when organized would not be liable for any debt or pecuniary obligation whatever, and doubtless the writer of this charter had before him that sec-

tion, for some of the language used seems to have been taken therefrom; but this is not the kind of corporation authorized by that section and does not profess to be. There is no question raised in this record as to the meaning of that clause in the section 2 which declares that all claims against the corporation shall be void, and therefore what is above said is not intended as expressing any opinion thereon, but the court is asked in the petition to define the personal liability of the trustees when acting in good faith in the management of the corporation or the expenditure of its funds. In that connection the petition states that difficulty has sometimes been experienced in securing otherwise desirable persons to act as trustees for fear of incurring personal liability. The trial court in answering that question construed the charter to mean that no personal liability was incurred when the trustees acted in good faith, but that "in contracting debts and creating encumbrances on college property their act in so doing shall be *ultra vires* and void, so far as binding the permanent funds of the college is concerned." If that is the correct view of the law it would appear that if a debt is incurred the corporation is not bound and the individuals are not bound unless they act in bad faith. We refer to this now only to show how far the language of this section is from that clearness and precision which is claimed for it.

We come now to the main question in the case. Section 2 starts out with forbidding the trustees to contract any debt against the corporation or to mortgage or otherwise encumber any of its property, but shall hold inviolate all furniture, stock, assets, lands, buildings, moneys or endowment funds, professorships, scholarships or other funds, preserving them in perpetuity, using only furniture, stock, lands and buildings and the interest of the funds; handing them down to their successors forever; and all claims against the

228 Sup—34

above named property shall be void in law," etc.  The clause forbidding the incurring of, debt and the words just quoted are embraced in one sentence and convey but one complete thought.  The sentence begins and ends with the thought of forbidding the incurring of debts, all else in the sentence is in furtherance of that thought.  The words expressing the initial thought are followed by and connected with the words last quoted by the conjunction "but."  The meaning of the word "but" varies somewhat according to the context.  According to Webster it is used to mean "except," and also sometimes to mean "on the contrary, on the other hand," and it was probably used in the latter sense in this context, that is, it was intended to say that the trustees should incur no debt and create no mortgage or lien, on the contrary they should hold inviolate the property, etc., "using only furniture, stock, lands and buildings, and the interest of the funds."  There is no grammatical connection between the first part of the sentence forbidding the incurring of debt and the part following the conjunction "but," unless it be that the latter has reference to the topic stated in the former.  Whichever meaning we give to the conjunction "but," whether "except" or "on the contrary," we must go back to the first part of the sentence to learn what the words following "but" mean.  The word "but" in that connection was not intended to begin a new sentence or introduce a new topic.  The sentence, taking all its parts together, means that the trustees shall not jeopardize the property by incurring debts or creating mortgages "but" shall preserve the same unbroken, and in place of incurring debt for any purpose they may use, for that purpose, only the income from the property and the interest from the funds, and beyond that what cannot be done without going in debt must be left undone.  It was debt that was feared and its consequences.  Under that clause the trustees were forbidden to incur debt

even for the necessary current expenses of maintaining the college. But the using for necessary current expenses, money given to them by donors without any direction as to the purposes for which it was to be used, would not be going in debt, and if we should interpret that sentence to mean that the trustees should not only not go in debt for such purpose, but should also not use for such purpose money so given, we would introduce a new topic into that sentence, and put a limitation on the powers of the board not indicated by the language. The language used shows that although in 1879 when the first charter was obtained the corporation had no funds, yet the organizers expected to accumulate funds, for they use the words "endowment funds, professorships, scholarships and other funds." And it is for the protection of those funds that the language in question is used. Those funds are to be held intact and only the interest from them used. Anyone familiar with the affairs of institutions of this kind knows the meaning of the terms, endowment fund, professorships and scholarships; they are terms indicating permanent investments for particular purposes or money designated to be so invested or held for a particular purpose. The limitation is on the use of the property and funds; the language is: "hold inviolate all furniture, stock, assets, lands, buildings, moneys or endowment funds, professorships, scholarships or other funds, preserving them in perpetuity, using only furniture, stock, lands, and buildings and the interest of the funds." The funds specified are such as are well known to be permanent in character, endowments, professorships, scholarships, and the general words "or other funds" following in that connection mean other funds *ejusdem generis*. Even if the word fund could ever be construed to mean money in an unlimited sense its use in this sentence forbids that construction, for here it is used in the specific sense of a permanent fund, "endowment fund, professor-

ship, scholarship," *et omnia ejusdem generis*. But our attention is called to the word "moneys" used in that connection; the context is, "all furniture, stock, assets, lands, buildings, moneys or endowment funds, professorships," etc. The word moneys is connected with the words endowment funds by the conjunction ".or." The word "or" has two significations. According to Webster it may be used to convey the idea of an alternative, that is, "you may read or you may write. . . . It corresponds to *either*. . . . It often connects a series of words or propositions presenting a choice of either; as, he may study law or medicine or divinity or he may enter into a trade." The word was evidently not used in that sense in this connection; the author of the instrument did not mean to say that the board of trustees should preserve intact either the moneys or the endowment funds, one or the other, as they might choose. But the same great author above quoted goes on to say that the conjunction "or" may be used to join different terms expressing the same thing or idea; as, "this is a sphere or globe." That is the sense in which the word "or" is here used; the word moneys was used by the author of the instrument as synonymous with the word endowment funds, professorships and scholarships. Money does not become an endowment until it is either set apart or at least designated for that purpose. Moneys that are given to this institution designated for a particular purpose, as for an endowment fund, a professorship, a scholarship or other purpose of like character, cannot be used for any other purpose without violating the terms of the charter, but money given without any designation of purpose may be used for such purposes as the board of trustees deem best for the good of the college. And judging the future by the past the benevolent patrons of this institution need have no fears of. the misappropriation of their gifts, but even if unlawful use of them should be made,

or attempted, the courts of the State are strong enough to right or prevent the wrong.

The evidence shows that a large part of the money and properties belonging to the corporation are carried in the name of the secretary of the board of trustees; the explanation given for that is that owing to the restriction in the charter concerning the incurring of debt and creating of liens, etc., it became necessary to do as was done. We express no opinion on that subject, because there is no question of that kind raised in the pleadings; we mention it only to show that we have not overlooked it. But whilst the fact is adversely criticised in one of the briefs for the respondent, no dishonest purpose or of concealment of the fact or loss to the corporation is suggested.

There is a prayer in the petition that the court construe that clause in section 1, article 3, referring to the power of the board of trustees to discharge any trustee, officer, agent or employee of the corporation, but there is no suggestion of any disagreement as to the meaning of that clause, and there is nothing obscure about it, therefore we see no use in discussing it.

One other point remains to be mentioned. The petition states that a doubt has arisen among the members of the board of trustees as to their being personally liable for their acts in the management of the affairs of the corporation and particularly in the expenditure of its funds. In answering this question the court does not undertake to say what personal liability, if any, a member of the board of trustees would incur in favor of a third person under the circumstances mentioned, because to do so would in effect forestall or prejudge a case not yet arisen and affect the rights of persons not parties to this suit. But as between the individual trustee and the corporation it is not improper to define their respective rights and

liabilities. By accepting the office of member of this board of trustees the individual enters into an implied contract with the corporation that in the exercise of the power that office confers on him he will faithfully observe and obey the mandates of the charter, and he becomes personally liable to the corporation for any breach of that implied contract, if the corporation should be damaged thereby. The fact that he may have acted in good faith would be no defense if he committed a breach of the contract. But it would be no breach of the contract if the transaction was one calling for the exercise of his judgment and he exercised that judgment in good faith, although it should turn out to have been bad or mistaken judgment. For example, this charter expressly forbids the trustees creating a debt on the credit of the corporation; they are given no discretion on that point, therefore, if the board should take such action as created such a debt it would be a breach of the implied contract and such of the trustees as created the debt would be liable to the corporation for the injury, if injury should result. But, again, for example, if a proposition should come before the board to purchase for the use of the college certain property or procure certain conveniencies, as water, light, etc., and the trustees in good faith should exercise their best judgment and make the purchase, or obtain the object proposed, paying for it out of money belonging to the corporation not devoted to any other special purpose, they would not be liable, even though it should turn out that the purchase was a bad one and loss entailed on the corporation, and what is here said of a purchase would apply to any other investment made in good faith.

The judgment is reversed and the cause remanded to the circuit court with directions to enter a decree construing the charter in question according to the law as in this opinion expressed, and entering judgment

that the corporation pay the costs of this suit, both in this and the circuit court. All concur, except *Woodson, J.,* not sitting.

REVERSED AND REMANDED (*with directions*)..